ALFONSO SUAREZ *v.* DICKMONT
PLASTICS CORPORATION
(14765)

BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js.

Argued January 13—decision released March 16, 1994*

*Scott S. Centrella,* with whom, on the brief, was *Richard E. Castiglioni,* for the appellant (plaintiff).

*Ann H. Rubin,* with whom, on the brief, was *Susan S. Chambers* and *Kevin C. Doyle,* for the appellee (defendant).

KATZ, J. The principal issue on appeal is whether the Appellate Court properly affirmed the trial court's granting of the defendant's motion for summary judgment based on the exclusive remedy provisions of the Workers' Compensation Act (act).[1] We hold that there

---

* March 16, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 31-284 provides in pertinent part: "BASIC RIGHTS AND LIABILITIES. CIVIL ACTION TO ENJOIN NONCOMPLYING EMPLOYER FROM ENTERING INTO EMPLOYMENT CONTRACTS. NOTICE OF AVAILABILITY OF COMPENSATION. (a) An employer shall not be liable to any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees as provided under this chapter, except that compensation shall not be paid when the personal injury has been caused by the wilful

is a genuine issue of material fact as to whether the plaintiff's injury was "substantially certain" to follow from his employer's conduct so as to satisfy the narrow exception to the exclusivity provisions of the act and to allow the plaintiff to pursue his common law remedy in a trial. We further hold that the plaintiff's previous collection of benefits under the act does not preclude his pursuit of this action. Accordingly, we reverse.

The following facts are undisputed. The plaintiff, Alfonso Suarez, filed a complaint alleging that he had been severely and permanently injured while working for the defendant, Dickmont Plastics Corporation, when, while attempting to clear hot molten plastic out of a plastic molding machine, two of his right hand fingers became caught in the machine and were partially amputated. The plaintiff alleged that his injuries, which resulted in a permanent loss of function and use of his master hand and substantial scarring, were caused by the defendant's wilful and serious misconduct. The plaintiff further alleged, inter alia, that the defendant: (1) always required the plaintiff and other employees to clean the plastic molding machine while it was in operation; (2) refused to allow the plaintiff or other employees to use safer cleaning methods; and (3) refused to equip the machine with a protective cover or other device in order to prevent injuries to persons operating or cleaning it.

The defendant moved for summary judgment claiming that, in the absence of proof by the plaintiff that

and serious misconduct of the injured employee or by his intoxication. All rights and claims between employer and employees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter, provided nothing in this section shall prohibit any employee from securing, by agreement with his employer, additional compensation from his employer for the injury or from enforcing any agreement for additional compensation."

the employer intended to injure the plaintiff, the exclusive remedy provisions of the act barred the plaintiff's claim. By affidavit, the defendant's president denied the plaintiff's allegations and maintained that he had not intended for the plaintiff to be injured. In his opposition to the motion, supported by his own deposition and the affidavit and attached opinion of Michael E. Shanok, a physical engineer, the plaintiff claimed that the defendant's intentional conduct was substantially certain to cause the injuries that occurred. At his deposition, the plaintiff testified that the defendant's foreman, although aware of the dangers involved, had told him that: (1) he could not use a vacuum cleaner to clean the hot material from the machine because it would waste material; (2) the machine could not be turned off during the cleaning because the operator would lose time; and (3) if he used the vacuum cleaner, he would be fired.

In his report, Shanok described the equipment involved as a plunger type horizontal injection molding machine used to melt thermoplastic and thermoset rubber polymers into a mold through the action of a hydraulically operated plunger. Shanok further explained that the material is fed from a small, cylindrical hopper with a conical bottom directly into a feed chute. From the chute, the material falls into an injection chamber. From there, an injection plunger is pushed by a hydraulic ram through a barrel surrounded by electrical heating bands. As the plastic is melted within the barrel, it is further pushed into the mold. The mold is held closed by a damping system, also hydraulically activated. At the conclusion of the molding cycle, the plunger retracts, the mold opens and the molded part is ejected, whereupon the next molding cycle commences.

Shanok's report further states that the feed chute should be vacuum cleaned when the material hopper

is positioned away from the feed chute, so that raw plastic cannot be fed into the machine during cleaning. Nevertheless, the plaintiff alleges that the foreman had ordered him to clean up *during* the completion of production, while the machine was still operating, so that the employer could avoid paying personnel overtime. Pursuant to these orders, he was required to reach into the chute with his hand to remove the remaining plastic pellets in the feed chamber to avoid wasting material. On the day of the accident, the plaintiff claims that he had put his hand into the energized machine's feed chute while the machine was operating, thereby causing the plunger to move forward in the injection sleeve and partially amputate two of the plaintiff's right hand fingers.

In addition, Shanok listed in his report several resulting violations of the Occupational Safety and Health Act (OSHA); 29 U.S.C. § 658 et seq.; General Industry Regulations; 29 C.F.R.; and deviations from the recommended requirements of the American National Standard for Safety Requirements for the Construction, Care and Use of Horizontal Injection Molding Machines. American National Standards Institute, B151.1-1976.[2] In particular, Shanok noted that the defendant's alleged conduct violated accepted safety standards by requiring employees to insert their hands into the feed chute of an energized horizontal injection molding surface, adding that the "circumstances which existed at the time of the subject accident caused such action to be even more dangerous, because the hydraulic system was not interlocked to prevent actuation of

---

[2] Shanok explained in his report that, as opposed to OSHA regulations, which require compliance by law, "[t]he American National Standard is a recommended practice which was developed through the auspices of the Society of the Plastics Industry, Inc., and is in such general use in the plastics industry that it can be considered to be an [authoritative] standard for the custom and practice of maintaining safety in the industry."

the plunger and the control panel is so situated that the operator cannot see an individual who is standing at the maintenance platform."

Shanok concluded that the defendant's actions "crossed the boundary between gross negligence and reckless disregard for the safety of its employees," that "there was a total absence of any sign . . . that even the slightest consideration for [the plaintiff's] safety had been undertaken," that remedying even one of the numerous unsafe actions could have prevented the injury, and that it was clear from the combination of factors that the plaintiff's injury "would be, sooner or later, a predictable and probable event."

The trial court granted the defendant's motion for summary judgment having determined that the plaintiff's "documentary proof [fell] short of the standard necessary to entitle him to benefit from the exception to the exclusivity provisions of the Connecticut Workers' Compensation Act." The plaintiff then filed a motion for articulation to ascertain whether the trial court had granted the defendant's motion for summary judgment on the grounds that the "substantial certainty" standard relied upon by the plaintiff was not controlling[3] or because the plaintiff had not demonstrated a genuine issue of material fact as to whether he could satisfy the substantial certainty test. The trial court denied the plaintiff's motion.[4] The plaintiff thereafter appealed the granting of the defendant's motion for summary judgment to the Appellate Court. The Appellate Court held that the plaintiff's factual alle-

[3] At the hearing on the motion for summary judgment, the trial court expressed doubt as to whether the plaintiff had to prove that his employer intended harm or whether it was sufficient to prove that his employer knew that injury was substantially certain to occur in order to prevail under this common law remedy.

[4] Following the trial court's denial of his motion for articulation, the plaintiff filed a motion for review with the Appellate Court. The Appellate Court granted the motion but denied the relief requested.

gations could not support a determination either that his employer had intended to harm him, or that his employer had believed the injury that occurred was substantially certain to follow from its acts or conduct. *Suarez* v. *Dickmont Plastics Corp.*, 30 Conn. App. 630, 635, 621 A.2d 1356 (1993). Accordingly, that court affirmed the judgment. Id., 636. We granted the plaintiff's petition for certification limited to the following issues: "(1) Whether an individual may bring a civil action for damages against his employer for injuries sustained at work where such injuries were caused by work conditions intentionally created by the employer which made the injuries substantially certain to occur?" and "(2) Whether there is a genuine issue of material fact as to whether the employer's intentional actions created a situation in which the employee's injuries were substantially certain to occur?" *Suarez* v. *Dickmont Plastics Corp.*, 225 Conn. 926, 625 A.2d 827 (1993).

At the outset, we note the standard of review of a trial court decision granting a motion for summary judgment. Pursuant to Practice Book § 384, summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking summary judgment " 'has the burden of showing the absence of any genuine issue as to all the material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law' "; *D.H.R. Construction Co.* v. *Donnelly,* 180 Conn. 430, 434, 429 A.2d 908 (1980); and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book § 381. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is

whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; internal quotation marks omitted.) *Connell* v. *Colwell,* 214 Conn. 242, 246–47, 571 A.2d 116 (1990).

We consistently have interpreted the exclusivity provision of the act, General Statutes § 31-284 (a), as a total bar to common law actions brought by employees against employers for job related injuries with one narrow exception that exists when the employer has committed an intentional tort or where the employer has engaged in wilful or serious misconduct. *Jett* v. *Dunlap,* 179 Conn. 215, 217, 425 A.2d 1263 (1979). This case presents the question of whether the complaint, deposition and affidavits submitted in opposition to the defendant's motion for summary judgment together sufficiently raise the genuine issue of material fact of whether the defendant employer engaged in an intentional tort or in wilful or serious misconduct, necessary to allow an employee to bring a common law tort action against his employer and thereby avoid the exclusivity of the act.

*Jett* v. *Dunlap,* supra, 179 Conn. 215, is the seminal case in which we articulated this narrow exception and held that the exclusivity of the act would not be eroded when the employee alleges an intentional tort by his supervisor. In *Jett,* we recognized the distinction between the actor who is "merely a foreman or supervisor," to which attribution of corporate responsibility for his or her conduct is inappropriate, and the actor who "is of such a rank in the corporation that he [or she] may be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity," to which attribution of corporate responsibility is appropriate. Id., 219. This distinction, relying on identification and not agency, was based entirely on status and not on conduct. The pleadings in *Jett,* however, did not allege that the employer had

directed or authorized the subject conduct or that the actor could be deemed the "alter ego" of the defendant's organization. Rather, the plaintiff alleged only that the employer had condoned the supervisor's offensive conduct after the fact. Because the injury, if any, resulted not from the employer's subsequent ratification, but rather from the employee's precedent intentional tort, we held that such condoning was not an intentional tort and did not relate back.

In this case, the plaintiff alleged that it was the defendant whose wilful and serious misconduct caused his injuries. Moreover, in his deposition, the plaintiff referred to the foreman's warning that "[i]f they see you, they fire you," in reference to what would have happened had he refused to clean the energized machine manually. The defendant denies requiring the plaintiff to clean the machine while it was in operation, although notably, there is no denial regarding the prohibition against using vacuums, as opposed to hands, to clean the machine. This question of credibility between the parties, however, raises an issue of fact which the trial court cannot resolve on a motion for summary judgment. *United Oil Co.* v. *Urban Redevelopment Commission,* 158 Conn. 364, 376, 260 A.2d 596 (1969).

Another significant case relied upon by the parties is *Mingachos* v. *CBS, Inc.,* 196 Conn. 91, 102, 491 A.2d 368 (1985), in which we further delineated the scope of the exception to the act. In that case we declined to "extend judicially the [*Jett* v. *Dunlap,* supra, 179 Conn. 215] exception to § 31-284 to include injuries to employees resulting from 'intentional,' or 'wilful,' or 'reckless' violations by the employer of safety standards established pursuant to federal and state law, such as OSHA." Id., 100. The plaintiff in *Mingachos* had alleged that the injuries were caused by the defendant's violations of certain Connecticut statutory regulations and

OSHA regulations, that said conduct was, as to the first count, " 'wilful and intentional and created a hazardous condition,' " and that the violations were, as to the second count, " 'reckless, and created a hazardous condition.' " Id., 95. The plaintiff further alleged, as to both counts, that the defendant had failed to warn its employees of these violations and had failed to report them to certain governmental agencies as required by law, and that these failures were " 'intentional, malicious, and in willful and wanton disregard of the health of the plaintiff's decedent . . . .' " Id., 112. In opposition to the motion for summary judgment, however, the plaintiff submitted only one affidavit, signed by his attorney, that referred to certain allocated, unverified OSHA records and that averred that the defendant had known of the dangerous ventilation condition but failed to correct it. Thus, the sole affidavit relied on by the plaintiff lacked personal knowledge of the affiant, the absence of which can be fatal. *Hartford Federal Savings* v. *Aetna Casualty & Surety Co.*, 25 Conn. Sup. 418, 427, 206 A. 650 (1964). Moreover, there was nothing on the record to suggest that the plaintiff had put into dispute the statements of the defendant's employees in their affidavits that each had had no intent to injure the plaintiff. Accordingly, we affirmed the trial court's granting of the summary judgment motion.

In defining the operative terms, we stated in *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 101, that "intent refers to the consequences of an act . . . [and] denote[s] that the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to follow from it. 1 Restatement (Second), Torts § 8A (1965)." (Citation omitted; internal quotation marks omitted.) "A result is intended if the act is done for the purpose of accomplishing such a result or with knowledge that to a substantial certainty such a result will ensue." 1 F. Harper

& F. James, Torts (1956) § 3.3, p. 216. An intended or wilful injury "does not necessarily involve the ill will or malevolence shown in express malice," but it is insufficient "to constitute such an [intended] injury that the act . . . was the voluntary action of the person involved." *Mingachos* v. *CBS, Inc.,* supra, 102. Both the action producing the injury and the resulting injury must be intentional. *Rogers* v. *Doody,* 119 Conn. 532, 534, 178 A. 51 (1935). "[Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. *Sharkey* v. *Skilton,* 83 Conn. 503, 507–508, 77 A. 950 (1910). The intentional injury aspect may be satisfied if the resultant bodily harm was the direct and natural consequence of the intended act. *Alteiri* v. *Colasso,* 168 Conn. 329, 334, 362 A.2d 798 (1975). *Markey* v. *Santangelo,* 195 Conn. 76, 77–78, 485 A.2d 1305 (1985)." (Internal quotation marks omitted.) *Mingachos* v. *CBS, Inc.,* supra, 102. The known danger involved must go from being "a foreseeable risk which a reasonable man would avoid and become a substantial certainty." W. Prosser, Torts (4th Ed. 1971) § 8, p. 32.

The substantial certainty test differs from the true intentional tort test but still preserves the statutory scheme and the overall purposes of the act. The problem with the intentional tort test, i.e., whether the employer intended the specific injury, "appears to be that it allows employers to injure and even kill employees and suffer only workers' compensation damages so long as the employer did not specifically intend to hurt the worker." *Beauchamp* v. *Dow Chemical Co.,* 427 Mich. 1, 25, 398 N.W.2d 882 (1986). Prohibiting a civil action in such a case "would allow a corporation to 'cost-out' an investment decision to kill workers." *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.,* 69 Ohio St. 2d 608, 617, 433 N.E.2d 572 (1982) (Celebrezze, J., concurring). The "substantial cer-

tainty" test provides for the "intent to injure" exception to be strictly construed and still allows for a plaintiff to maintain "a cause of action against an employer where the evidence is sufficient to support an inference that the employer deliberately instructed an employee to injure himself." *Gulden* v. *Crown Zellerbach Corp.*, 890 F.2d 195, 197 (9th Cir. 1989).

The issue then is whether the defendant established as a matter of law that the plaintiff's evidence of the defendant's refusal to allow employees to *vacuum* the machinery *after* it has been shut down failed to raise an issue of fact that such conduct was substantially certain to result in injury. We are obliged to accept as true all well pleaded facts and the plaintiff's evidence offered in opposition to the defendant's motion, and to determine whether the plaintiff's claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right to recovery. The defendant employer argues that it satisfied its burden of demonstrating that its conduct did not carry with it, as a substantial certainty, the dangers that in fact resulted and that the dangers were known to the defendant.[5] We disagree.

---

[5] The defendant also argues for the first time that Shanok's report may not be considered as evidence because it "is simply a hearsay statement, without foundation of competency as an 'expert' opinion." We disagree. Affidavits must be by persons who would testify to their contents at trial; Practice Book § 381; however, there is nothing on this record to suggest that Shanok could not testify regarding his objective findings as contained in his report as an expert or that the trial court ever questioned his competence. There is no reason for this court to be the first to engage in such an inquiry. Moreover, because the defendant's allegations "require the plaintiff to undertake the difficult challenge of providing evidence, in advance of trial, of the mental state of the defendant . . . we are willing to take into account whatever relevant information the plaintiff was able to provide. See *Batick* v. *Seymour,* 186 Conn. 632, 645–46, 443 A.2d 471 (1982)." *Conference Center Ltd.* v. *TRC,* 189 Conn. 212, 217, 455 A.2d 857 (1983). This would naturally include Shanok's description of the machinery and the cleaning process the plaintiff was required to perform.

Intent is clearly a question of fact that is ordinarily inferred from one's conduct or acts under the circumstances of the particular case. *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 216–17, 477 A.2d 988 (1984). Thus, whether the actor knows that the consequences of his or her conduct are certain or substantially certain to result from his or her act and still proceeds with the conduct, so that he or she should be treated by the law as though he or she in fact desired to produce the result, is a question of fact for the jury. This case undoubtedly raises an issue of material fact regarding the defendant's conduct toward the plaintiff and the defendant's knowledge that the plaintiff's injury was substantially certain to occur.

Here, a jury could reasonably infer, from all the circumstances viewed in the light most favorable to the plaintiff, that the defendant's conduct constituted more than a mere failure to provide appropriate safety or protective measures, and that the plaintiff's injury was the inevitable and known result of the actions required of him by the defendant. " 'A specific intent to produce injury is not the only permissible inference to be drawn from [the] defendant's [conduct], but it is one that a jury should be permitted to consider. It is for the finder of fact, not the court on summary judgment, to determine what inferences to draw. . . .' " *Gulden* v. *Crown Zellerbach Corp.,* supra, 890 F.2d 197. "[S]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." (Internal quotation marks omitted.) *Batick* v. *Seymour,* 186 Conn. 632, 646–47, 443 A.2d 471 (1982).

We are not prepared to say as a matter of law that the refusal to allow employees to vacuum the machinery after it has been shut down did nothing more than merely set the stage for an accidental injury later, or

that it was no more than merely a wilful failure to furnish a safe place to work. Under the circumstances of this case, whether the intentional conduct in which the defendant engaged was tantamount to a "deliberate infliction of harm comparable to an intentional left jab to the chin"; 2A A. Larson, Workmen's Compensation (1990) § 68.13, p. 13-71; is a question best left to the jury.[6]

Notably, several other appellate courts also have decided that it is for the jury to evaluate whether the employer's intentional conduct allows the inference that the employer knew that the occurrence of the injury was a substantial certainty. See, e.g., *Gulden* v. *Crown Zellerbach Corp.*, supra, 890 F.2d 197 (allegations that the defendant was aware that the plaintiffs' contact with PCBs would injure them but nevertheless ordered them to perform their task in a manner requiring them to initiate and maintain such contact were sufficient to allow a jury to decide whether to draw an inference of deliberate intent to injure from those facts); *O'Brien* v. *Ottawa Silica Co.*, 656 F. Sup. 610, 611–12 (E.D. Mich. 1987) (despite knowledge that the plaintiff was contracting respiratory disease, the employer's failure to take precautions to inform the plaintiff of reported health risks might permit an inference that the employer knew injury was substantially certain to occur); *Kachadoorian* v. *Great Lakes Steel Corp.*, 168 Mich. App. 273, 277, 424 N.W.2d 34 (1988) (the plaintiff's allegations that the plaintiff's decedent had been directed by his foreman to drive his slag-moving machine under a vessel containing molten steel during a blowing process that frequently caused overflow

---

[6] The trial judge will be free to make clear to the jury the differences between intentional conduct that is substantially certain to result in injury and conduct that merely carries with it a foreseeable risk. He or she also will be free to comment on the evidence so that the distinction is clearly before the jury where it belongs.

spills of molten steel and that the defendant had disciplined employees for refusing to drive under the vessel during the blowing process, thereby forcing the employee to choose between the substantial certainty of injury and losing his job, were enough to raise an issue of fact as to the defendant's intent); *Kielwein* v. *Gulf Nuclear Inc.*, 783 S.W.2d 746, 747–48 (Tex. App. 1990) (whether the employer's failure to take appropriate measures to protect the plaintiff during the cleanup operation of a radiation spill was substantially certain to cause the plaintiff injury and was substantially certain to result in radioactive contamination is "uniquely a fact question for the trier of fact after considering all the relevant evidence").

The defendant also claims, as an alternate ground for affirming the trial court's judgment, that the plaintiff's application for and receipt of workers' compensation benefits bars him from any further recovery against the defendant. According to the defendant, the plaintiff's receipt and retention of benefits under the act constitutes an admission that the incident falls within the scope of the act. As authority for its argument, the defendant cites to cases that have interpreted General Statutes § 31-284 to exclude further recovery from the employer by an employee who has received workers' compensation benefits. See *Horney* v. *Johnson,* 167 Conn. 621, 622, 356 A.2d 879 (1975); *Pagani* v. *BT II Ltd. Partnership,* 24 Conn. App. 739, 744, 592 A.2d 397, cert. dismissed, 220 Conn. 902, 593 A.2d 968 (1991); *Ross* v. *New Haven,* 19 Conn. App. 169, 171, 561 A.2d 457 (1989); *Hatcher* v. *Bullard Co.,* 39 Conn. Sup. 250, 257, 477 A.2d 1035 (1984), aff'd, 4 Conn. App. 260, 493 A.2d 908 (1985).

These cases, however, do not stand for the proposition advanced by the defendant. In *Ross* v. *New Haven,* 19 Conn. App. 169, supra, the injured employee was seeking to collect uninsured motorist benefits from the

city employer. In *Horney* v. *Johnson,* supra, 167 Conn. 621, the injured employee was seeking to bring a common law negligence claim against his corporate employer. In *Pagani* v. *BT II Ltd. Partnership,* supra, 24 Conn. App. 739, the plaintiff's passive acceptance of benefits paid by the defendant's workers' compensation carrier was held not to preclude her from maintaining a civil action for a personal injury that she claimed did not arise out of or in the course of her employment. In *Hatcher* v. *Bullard Co.,* supra, 39 Conn. Sup. 257 n.2, the trial court, in dictum, interpreted the act to preclude an action for intentional, wilful or wanton violations of safety regulations.

The effect of the defendant's argument would be to force an injured employee to elect, at the outset, whether to pursue his or her remedies under the act, or to take his or her chances later at trial. The defendant's argument finds no support in the act itself or in our case law, and, if successful, would undermine the policies underlying the act.

Indeed, judicially imposing the election of remedies doctrine in this case would, in all practical effect, insulate employers from the consequences of their intentionally harmful conduct toward their employees. We have little doubt that most employees, who had been injured in the course of their employment by conduct of their employers that would in a subsequent lawsuit be found to have been intentionally harmful to them would not undergo the financial privations of foregoing workers' compensation benefits in order to litigate their tort actions against their employers years later. The effect would, in all likelihood, be that the tort action would be a remedy in name only, and that the intentionally harmful conduct would go unpenalized.

The act was designed to hold the employer liable for job related injuries, without regard to fault; *Klapproth*

v. *Turner,* 156 Conn. 276, 279, 240 A.2d 886 (1968); so that employees may obtain relatively quick and certain compensation, while employers generally avoid the risk and expense of litigation stemming from common law tort actions. *Mingachos* v. *CBS, Inc.,* supra, 196 Conn. 97. The principle of exclusivity is not eroded, however, when the plaintiff alleges an intentional tort, in which case an employee is permitted to pursue remedies beyond those contemplated by the act. Although an injured employee's remedies provided by the act are exclusive and cannot be *supplemented* with common law damages, there is no provision in the act that *requires* the injured employee to make an election between even mutually exclusive remedies.

Although courts in some jurisdictions hold that the collection of workers' compensation benefits bars a damage suit,[7] others take a less restrictive approach. In *Millison* v. *E.I. du Pont de Nemours & Co.,* 101 N.J. 161, 186, 501 A.2d 505 (1985), for example, the New Jersey Supreme Court held that the doctrine of election of remedies did not bar the plaintiffs, who had filed claims under the New Jersey Workers' Compensation Act, from pursuing a civil action for intentional torts even though it was undisputed that the plaintiffs' claims were compensable under that act. The court held that "the best approach is to allow a plaintiff to process his [or her] workers' compensation claim without forfeit-

---

[7] See, e.g., *Collier* v. *Wagner Castings Co.,* 81 Ill. 2d 229, 241, 408 N.E.2d 198 (1980); *Neff* v. *Baiotto Coal Co.,* 361 Mo. 304, 307, 234 S.W.2d 578 (1950); *Biner* v. *Dynalectron Corp.,* 85 Nev. 539, 540, 458 P.2d 616 (1969); *Gillespie* v. *Vecenie,* 292 Pa. Super. 11, 16–17, 436 A.2d 695 (1981). This is distinct from the issues of whether an unsuccessful damage suit bars a compensation claim or whether an unsuccessful compensation claim bars a damage suit. The majority of courts have held that in neither instance will the injured employee be estopped. See 2A A. Larson, supra, § 67.31, pp. 12-152–12-156 nn.88 and 89, and cases cited therein. According to those cases, the injured employee was not forced to elect between two valid but inconsistent remedies. Rather, he only mistakenly pursued a misconceived right when only one right in fact existed. Id., § 67.32, p. 12-159.

ing the opportunity to establish that he [or she] was injured as a result of" intentionally wrongful conduct. Id., 187. Additionally, to the extent that a damage award would serve as a double recovery, the court held that the employer would be entitled to offset any compensation benefits previously paid against a damage award. Id.[8]

Although the doctrine of election, to the extent that it is designed to prevent double redress for the same injury, has a sound basis, it can also serve to destroy all rights under compensation acts without justification.[9] "Workmen's compensation is above all a secur-

---

[8] Of those courts that follow the election theory, many, however, will enforce it only where the court is satisfied that the employee had " '[f]irst full knowledge of the nature of the inconsistent rights and the necessity of electing between them [and s]econd, an intention to elect manifested, either expressly or by acts which imply choice and acquiescence.' " *McAlester Corp.* v. *Wheeler*, 205 Okla. 446, 448, 239 P.2d 409 (1951). Mere acceptance of some compensation benefits by an injured employee will not constitute an election in the absence of some evidence of both his or her conscious intent to elect the remedy under the compensation statutes and to waive his or her other rights. 2A A. Larson, supra, § 67.35, pp. 12-182–12-189; see *Martin* v. *United States*, 566 F.2d 895 (4th Cir. 1977); *Whitney-Fidalgo Seafood, Inc.* v. *Beukers*, 554 P.2d 250 (Alaska 1976); *Baker* v. *Redystick Products Co.*, 674 P.2d 1011 (Colo. App. 1983); *Bolinger* v. *Kiburz*, 270 N.W.2d 603 (Iowa 1978); *Conder* v. *Hayden*, 335 S.W.2d 909 (Ky. 1960); *Allman* v. *Great Lakes Dredge & Dock Co.*, 29 App. Div. 2d 605, 285 N.Y.S.2d 630 (1967).

Courts that apply the election of remedies doctrine have examined various issues regarding its application, including, but not limited to: whether it should matter if recovery under the act is claimed before, or after, a civil suit is commenced; whether the ability to collect money awarded by a civil judgment should have any impact; and whether it should matter if the collection of benefits under the act resulted from an award, voluntary agreement or consensual conduct in the absence of a claim. See generally 2A A. Larson, supra, §§ 67.30–67.36.

[9] This state has obviously already determined that compensation protection is a good policy for industry generally. See 1 F. Harper & F. James, Torts (1956) pp. xlii–xliii. To the extent that an election requirement can motivate employers to risk common law liability, it should be discouraged. To the extent that the election requirement may interfere with an injured employee receiving compensation for his or her injuries, it should be avoided.

ity system; a strict election doctrine transforms it into a grandiose sort of double-or-nothing gamble. Such gambles are appealing to those who still think of the judicial process as a glorious game in which formal moves and choices are made at peril, and in which the ultimate result is spectacular victory for one side and utter defeat for the other. The stricken workman is in no mood for this kind of play, and should not be maneuvered into the necessity for gambling with his rights, under the guise of enforcing a supposed penalty against the employer." 2A A. Larson, supra, § 67.31, p. 12-158. Because the employer can be reimbursed by way of a setoff, double redress is avoided. This approach is not without precedent. See, e.g., *Whitney-Fidalgo Seafood, Inc.* v. *Beukers,* 554 P.2d 250, 254 (Alaska 1976) (court held that mere acceptance of workers' compensation benefits by the employee did not constitute an election and therefore the employee could bring his common law suit, but payments made would be applied against any damage judgment he obtained); *Worthington* v. *Industrial Commission of Arizona,* 85 Ariz. 310, 316, 338 P.2d 363 (1959) (court held that receipt of workers' compensation benefits did not cause a widow to lose her rights to bring a wrongful death action although the sum received in the tort settlement could be offset against the amount of any compensation recovery); *Mike* v. *Aliquippa,* 279 Pa. Super. 382, 393, 421 A.2d 251 (1980) (court held that any compensation benefits that had been accepted would be duly credited against any recovery from the tort action to prevent any possibility of double recovery).

We are not unmindful that our opinion today may trigger concerns among employers regarding their potential exposure to claims on two fronts. We do not believe that our holding, however, will encourage significant additional litigation, for only in those rare instances when an employer's conduct allegedly falls

within the very narrow exception to the act will such litigation result. In those very few instances, we believe that it is better to allow employees to accept the well conceived and often vital benefits of the act rather than to gamble all on a potential recovery that is not likely to provide compensation until considerably later. We think the setoff provisions used routinely by our judges in other areas[10] provide adequate protection for employers on those rare occasions where a suit follows recovery under the act.

[10] See, e.g., General Statutes § 52-225a, which provides: "REDUCTION IN ECONOMIC DAMAGES IN PERSONAL INJURY AND WRONGFUL DEATH ACTIONS FOR COLLATERAL SOURCE PAYMENTS. (a) In any civil action, whether in tort or in contract, wherein the claimant seeks to recover damages resulting from (1) personal injury or wrongful death occurring on or after October 1, 1987, or (2) personal injury or wrongful death, arising out of the rendition of professional services by a health care provider, occurring on or after October 1, 1985, and prior to October 1, 1986, if the action was filed on or after October 1, 1987, and wherein liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages, as defined in subdivision (1) of subsection (a) of section 52-572h, by an amount equal to the total of amounts determined to have been paid under subsection (b) of this section less the total of amounts determined to have been paid under subsection (c) of this section, except that there shall be no reduction for (1) a collateral source for which a right of subrogation exists and (2) that amount of collateral sources equal to the reduction in the claimant's economic damages attributable to his percentage of negligence pursuant to section 52-572h.

"(b) Upon a finding of liability and an awarding of damages by the trier of fact and before the court enters judgment, the court shall receive evidence from the claimant and other appropriate persons concerning the total amount of collateral sources which have been paid for the benefit of the claimant as of the date the court enters judgment.

"(c) The court shall receive evidence from the claimant and any other appropriate person concerning any amount which has been paid, contributed, or forfeited, as of the date the court enters judgment, by, or on behalf of, the claimant or members of his immediate family to secure his right to any collateral source benefit which he has received as a result of such injury or death."

The judgment of the Appellate Court is reversed and the case is remanded to that court for further proceedings.

In this opinion BERDON, NORCOTT and PALMER, Js., concurred.

BORDEN, J., dissenting and concurring. I disagree with the majority that, on this record, the plaintiff has created a question of fact sufficient to bring the defendant's conduct within the intentional tort exception to the exclusivity provision of the Workers' Compensation Act. I agree with the majority, however, that the plaintiff's application for and receipt of workers' compensation benefits did not bar him from asserting a proper cause of action based upon that exception. Because I disagree with the majority's resolution of the dispositive issue, therefore, I dissent from the ultimate disposition of the case by the majority. I would affirm the judgment of the Appellate Court.

I begin, briefly, with the second issue, namely, whether the application for and receipt of workers' compensation benefits bars an employee from later asserting a common law action against his employer based upon the employer's intentionally tortious conduct. For all of the reasons so aptly stated by the majority, I agree, and join that part of the opinion.

I believe, however, that the majority has misapplied the intentional tort exception to the act's exclusivity provision. The gist of the majority opinion is that the plaintiff created a question of fact, sufficient to withstand a motion for summary judgment, on the issue of whether the defendant "believe[d] that the consequences of [its] conduct [were] substantially certain to follow from [that conduct.]" (Internal quotation marks omitted.) *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 101, 491 A.2d 368 (1985). Although this case presents a close question, I disagree.

First, there are some "facts" upon which both the plaintiff and the majority rely, that are not properly cognizable on a motion for summary judgment, involving the ordinarily elusive issue of a party's state of mind. These are the assertions in the affidavit of the plaintiff's expert, Michael E. Shanok, that the defendant's conduct exceeded gross negligence and recklessness, and that there was a total absence of indication that the defendant had undertaken "even the slightest consideration for the plaintiff's safety." These assertions, although contained in Shanok's affidavit, are not properly cognizable for purposes of a motion for summary judgment because they would not be admissible at trial.[1]

It is axiomatic that, in responding to a motion for summary judgment in which the movant has made a showing of no material issue of fact, the other party's affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Practice Book § 381; *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 111. Although we have gone quite far in permitting experts to opine on matters upon which a jury would not ordinarily have its own informed knowledge; *State* v. *Borelli*, 227 Conn. 153, 164, 629 A.2d 1105 (1993); *Davis* v. *Margolis*, 215 Conn. 408, 416, 576 A.2d 489 (1990); *Puro* v. *Henry*, 188 Conn. 301, 309, 449 A.2d 276 (1982); *Funding Consultants, Inc.* v. *Aetna Casualty & Surety Co.*, 187 Conn. 637, 645, 447 A.2d 1163 (1982); I know of no civil case in which we have held that an expert—even a professional engineer, like Shanok—can opine that the defendant had the state of

---

[1] I have some doubts about the evidentiary admissibility of other of Shanok's conclusions, but the two identified in the text are, in my view, the most clearly inadmissible.

mind that the tort alleged requires.[2] The assertions in Shanok's affidavit to which I have referred are nothing more than that.

I agree with the majority that questions of state of mind, ordinarily provable only by circumstantial evidence, are also ordinarily left to the jury. But that proposition also necessarily implies that such a question, requiring nothing more than the application of common sense and human experience, is not the kind of question that an expert is any more qualified to answer than six lay jurors. Therefore, such a question, calling for an opinion that is not within the expertise of any expert, is properly objectionable. The plaintiff's case, consequently, must be viewed shorn of those assertions by Shanok.

This leaves the plaintiff's case, on the defendant's summary judgment motion, as consisting of the description of the cleaning process that the plaintiff was required to follow,[3] plus Shanok's opinions that: (1) proper cleaning of the feed chute was by vacuum, with the hopper positioned so that it would be unable to continue feeding raw plastic during the cleaning; (2) the cleaning process that the plaintiff was required to follow violated several Occupational Safety and Health Act regulations, industry safety regulations, and certain national safety standards regarding injection molding machines; (3) remedying even one of the unsafe conditions would have prevented the accident; and (4) it was clear from all of these factors that the plaintiff's injury "would be, sooner or later, a predictable and probable event." I conclude that the sum of these facts,

---

[2] Indeed, in the criminal arena, experts are statutorily barred from giving such opinions. See General Statutes § 54-86i.

[3] I am willing for purposes of this case to assume, as the majority also does, the evidentiary admissibility of the plaintiff's statement regarding his foreman's warning to him that he would be fired if he did not follow that cleaning process.

even with all of the reasonable inferences to be drawn from them in favor of the plaintiff, was inadequate for a rational inference that the defendant believed that it was substantially certain that the plaintiff's injuries would follow.

I start with the proposition that permitting an employee to sue his employer for injuries intentionally caused to him constitutes "a narrow exception to the exclusivity of the act." *Mingachos* v. *CBS, Inc.,* supra, 196 Conn. 99. Thus, unlike the usual rule of construction of the act, which is to construe it broadly in favor of its remedial purposes; *Hansen* v. *Gordon,* 221 Conn. 29, 32, 602 A.2d 560 (1992); *Ash* v. *New Milford,* 207 Conn. 665, 672, 541 A.2d 1233 (1988); the exception should be construed narrowly, so that its exceptional confines are not too easily breached.

Furthermore, our case law in the area of this narrow exception recognizes the difference between an intentional tort and imposition of a highly foreseeable risk. *Mingachos* v. *CBS, Inc.,* supra, 196 Conn. 103. Although that line "often grows thin, it has always been deemed to exist: On the other hand, the mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but it is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a substantial certainty. *Keating* v. *Chemical Co.,* [610 F.2d 328, 332 (5th Cir. 1980)]." (Internal quotation marks omitted.) Id.

Moreover, reckless misconduct differs from intentional misconduct. "While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. 3 Restatement (Second), Torts § 500, comment (f) (1965). It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from a substantial certainty without which he cannot be said to intend the harm in which his act results." (Internal quotation marks omitted.) Id.; see also *American National Fire Ins. Co.* v. *Schuss*, 221 Conn. 768, 776, 607 A.2d 418 (1992) (discussing difference between intentional and negligent conduct).

This body of case law, therefore, indicates that the language of "substantial certainty," as used in the lexicon of the intentional tort exception to the exclusivity of workers' compensation benefits, is essentially intended to describe a surrogate state of mind for purposefully harmful conduct, but not to describe conduct that, albeit blameworthy, is simply reckless. The Restatement of Torts, from which this language is derived, makes this even clearer. "The word 'intent' is used throughout the Restatement . . . to denote that the actor desires to cause consequences of this act, or that he believes that the consequences are substantially certain to result from it." 1 Restatement (Second), Torts § 8A (1965). "All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences that are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the conse-

quences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness . . . ." Id., comment (b).

The illustration of this principle describes one who throws a bomb into an office desiring to kill A, but knowing that B, a stenographer, is in the office. Although there was no desire to injure B, the actor knew with substantial certainty that his conduct would do so. Id., illustration 1. Indeed, we have indicated our approval of the same extremely high degree of knowledge required by the phrase "substantial certainty." See *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 101 n.12 ("substantial" means about, practically, nearly, almost, essentially; and "certain" means sure and inevitable).

In my view, the plaintiff's proper proof adduced in response to the defendant's motion for summary judgment simply cannot be stretched beyond the realm of recklessness. Indeed, this is the import of Shanok's conclusion that the plaintiff's injury "would be, sooner or later, a *predictable* and *probable* event." (Emphasis added.) What is predictable and probable is not certain; if it were, any reckless conduct would also fall within the intentional conduct exception.

My conclusion in this regard is buttressed by the conclusion of the majority, with which I agree, that the plaintiff is not barred by his receipt of workers' compensation benefits from asserting his intentional tort action. Thus, in determining whether an employee has sufficiently established his employer's belief that he will be injured, we are not faced with a choice of leaving the employee without any compensation for his work-related injuries by holding him to a strict standard. The majority, however, has in effect given him the benefit of both the workers' compensation and tort worlds: he

can collect his workers' compensation benefits, and then also collect tort compensatory damages from his employer for reckless conduct.