[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON EMHART INDUSTRIES' MOTION FOR SUMMARY JUDGMENT
In this case the defendant, Emhart Industries, Inc., has filed a motion for summary judgment against the claim of the plaintiff, Victor Recalde. Mr. Recalde was hired by the defendant company in January 1993 as a molding machine operator. On February 21, 1993, he was seriously injured while at work. Despite the exclusivity of the remedy provided under the state Workers' Compensation Act, the plaintiff makes his claim under an exception to that exclusivity rule based on his assertion that the defendant employer either intended the injuries complained of or intended the act or conduct which was substantially certain to result in his injuries.
 1.
The standards to be applied in deciding a motion for summary judgment are well known. Section 17-49 of the Practice Book provides summary judgment "shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." If there is a genuine issue of material fact presented by the affidavits, depositions or documents presented by the parties, the trial court cannot decide it — this is so because the parties have a constitutional right to have issues of fact decided by a jury and trial courts should exercise caution before depriving a CT Page 1273 party of that right by granting such a motion. Spencer v. GoodEarth Restaurant. Corp. , 164 Conn. 194, 196 (1972) .
It has also been said "that summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions." United Oil Co. v. UrbanRedevelopment Commission, 158 Conn. 364, 376 (1969). As will be more full discussed, the intentional employer activity leading to employee injury which allows an exception to the exclusive remedy provision of our Workers' Compensation Act (the Act) posits an "intent" which "extend[s] not only to those consequences which are desired but also to those which the actor believes are substantially certain to follow from what [the employer] does."Mingachos v. CBS, Inc., 196 Conn. 91, 101 (1985). Mingachos at page 103 notes that an employer who acts believing it is causing an appreciable risk of injury to a worker may be negligent, if the risk is greater then the conduct might be classed as reckless but still not intentional, but if the conduct creates a risk of harm that is substantially certain to result, then the conduct is intentional not only at common law, Restatement (Second) Torts § 8A, but also for purposes of defining an exception to the exclusivity provision of the act. The plaintiff argues that summary judgment procedure is ill adapted to intentional tort cases not only where intent to cause a desired result is involved (not claimed here) but where substantial certainty of injury caused by intended predicate acts is involved — that is so, according to the defendant, because of the different gradations of risk of harm presented by an intentional act which range from negligence to a risk that is substantially certain of causing injury. The plaintiff goes on to argue that summary judgment procedure is also ill-suited for resolving questions of intent for the further reason that their resolution depends largely on an assessment of demeanor and credibility — issues that are particularly in the province of the jury. Gorra Realty. Inc. v.Jetmore, 200 Conn. 151, 164 (1986).
For the court, at least the foregoing discussion frames the issue to be decided which turns ultimately on the viability of summary judgment procedure under the substantial certainly exception to the exclusivity provision of our act. The court will discuss the facts in order to frame the ambit of this issue as it applies to this case.[1]
 2. CT Page 1274
The facts presented by the parties on this motion are of course determinative. Interestingly, the parties do not seem to disagree as to any of the material facts; that is, no factual dispute regarding the ultimate facts determinative of the case is presented. At most, one side raises one set of facts and the other side points to other evidence. The task for the court is to decide whether the motion can or perhaps should be decided as a question of law.
The court will first discuss the undisputed facts presented by the defendant Emhart because it is the moving party and has the burden of persuasion on this motion. The court will then discuss the facts and evidence raised by the plaintiff Recalde; the defendant Werner Pfleiderer has adopted Recalde's factual and evidentiary presentation.
Immediately prior to his injury, the plaintiff was operating a rubber injection molding machine manufactured by Werner Pfleiderer (Werner) and sold to the defendant Emhart. This machine was used by Emhart to manufacture rubber grommets; these grommets are fashioned out of heated rubber poured into a mold. A pneumatically driven internal knockout device, at the rear of the machine, dislodges the grommets from the mold. The operator of the molding machine directs the entire process from a control panel at the front of the machine, that is, the normal production process involves the worker operating the machine by means of a control panel located at the front of the machine.
Mr. Recalde was hired by Emhart on January 2, 1993 as a molding machine operator at its Pop Fasteners facility in Shelton. Prior to that, Recalde had worked on industrial machines for many years. At one employer he received one month of on the job training in the operation of cutting machines and drill presses. He then worked at Gordon Rubber operating rubber compression molding machines where he received training on their operation. In 1979, he became employed at General Electric where he remained until its Bridgeport plant closed in 1987. While at General Electric, he operated extruder and coiling machines. He then worked for two years as a grinding machine operator and then five years at another company as a molding machine operator.
When Recalde was hired in January 1993 by the defendant, he received safety training for the operation of the molding machines he was to work at. None of Recalde's numerous previous CT Page 1275 positions involving the operation of industrial machinery required him to repair machines nor had he been trained on the repair of industrial machinery. Regarding the repair of the molding machines he was assigned to operate at Emhart, the defendant it its supplemental brief quotes the following language from a deposition given in this case by Mr. Recalde:
 Q Okay. But did anyone at Pop Fasteners tell you that it was your responsibility to fix the machines? A I don't remember.
 Q Did you ever set up a machine at Pop Fasteners? A No.
 Q Besides replacing — withdrawn. Did you ever repair a machine prior to your accident at Pop Fasteners? A Like I said before, I would change the knockout pins but that wouldn't be to repair them.
 Q That's not a repair? A No, just change them.
 Q Did you receive any training on repairing machinery at Pop Fasteners? A No.
 Q Did anyone ever tell you to repair the machines at Pop Fasteners? A No.
(Pages 310-311 of Recalde deposition.)
The defendant also refers to the deposition testimony of Mr. Cavallaro, the manager of the Pop Fastener plant. He testified that Recalde was told not to repair the machine. The court has reviewed pages 82 and 83 of his deposition and will discuss it in more detail. Cavallaro said the molding machines do not operate trouble-free but the operator runs the machine. It is the "set-up" person's job to fix the machine, not the operator. If "something gets jammed or broken or whatever," the operator calls the setup person and, if there's no setup person, the operators "usually leave it down. . . . You don't run it. . . . That's what they are supposed to do. I mean, they're not trained to repair it; they shouldn't try to repair it." The court will discuss in more detail the question of repair to the machines by operators CT Page 1276 like Mr. Recalde when it discusses the plaintiff's factual allegations. The court should note that Mr. Cavallaro also testified that on the night of the accident there were two machines available to be operated and only one more person scheduled to come in to work at the machines.
The defendant presented the following facts with respect to the actual occurrence of this tragic accident which caused such serious injury to Mr. Recalde: Mr. Recalde reported to work for the third shift on the evening of February 21, 1993. Twenty minutes into his shift, Recalde noticed that the internal knock-out device on the molding machine was malfunctioning. He unsuccessfully tried to restart the knock-out device by using the molding machine's control panel. He then got an adjustable wrench from a toolbox which was not used to fulfill his responsibilities in operating the machine. He walked to the rear of the machine climbed a ladder to the top of the knock-out device and attempted to manually repair it. He proceeded to tighten two bolts that appeared to him to be causing the malfunction. As he tightened the second bolt, the knock-out device retracted and Recalde's right hand was caught in the internal knock-out device.
The plaintiff has referred to additional facts in its opposition to the motion for summary judgment. The plaintiff notes that the manufacturer of the molding machine at which he was injured had installed a "safety gate" on the back portion of the knock-out system of the machine (testimony of a Mr. Huber who was apparently a customer service employee of Werner Pfleiderer Corp., the manufacturer). The plaintiff then points to the pleadings of the manufacturer to add Emhart as a third party defendant to establish that Emhart removed the "safety gate." But Werner is certainly not an agent of the defendant Emhart so as to bind the latter by allegations in its pleadings and a statement or admission by one party cannot be considered an admission of another party. Cf. Palombizio v. Murphy, 146 Conn. 352, 355
(1959); Pluhowsky v. New Haven, 151 Conn. 337, 343 (1964). Also, the court cannot give any evidentiary weight to the bald, unsupported statement that Emhart provided photographs showing the safety gate prior to its removal. In its brief, however, Emhart assumed for the purposes of its motion that the safety gate or cage guard was removed by the defendant Emhart so the court will take this as established for the purposes of this motion.
The night of the accident, Recalde and only one other CT Page 1277 employee were scheduled for work; a bad snowstorm was in progress but the plant did not close down and Recalde showed up to work. Recalde was alone in the plant because the other employee did not appear for work. As was his custom, Recalde checked the instructions left by the supervisor of an earlier shift as to what he was to do and the machine he was supposed to run. Mr. Cavallaro at his deposition testified that the operators must run the machines they were scheduled to run. The note from the supervisor indicated that Recalde and the other employee were to run machines number one and four; Recalde started to run machine four. The machine got stuck and Recalde tried to locate the source of the problem so he could continue with his work. There was another machine at which he could have worked; the reason he did not do so is that he was "expecting" the other worker to show up. "I didn't know if she was coming or not. Yeah, there was another machine."
The plaintiff also refers to that portion of Mr. Recalde's deposition where he states he just started the job and was fearful of losing it if he did not perform. However, Mr. Recalde also testified that he did not know if, based on anything communicated to him while at the plant, he would have gotten into trouble if he shut the machine down, wrote in the log how it malfunctioned and went home. He did not know what the company policy was if a worker's machine would not function and the worker left; no spoken or written policy was given to him regarding such a situation. Recalde also testified that while he worked there he never observed a situation where a worker missed work and was penalized or reprimanded.
In any event, the plaintiff proceeded to try to fix or repair the machine when it malfunctioned. The court will now refer to the plaintiff's position on the repair responsibility of machine operators like Mr. Recalde. In its brief, the plaintiff takes strong issue with the defendant's statement that Recalde "was explicitly told not to attempt to repair the machine." The plaintiff believes this characterization of Cavallaro's deposition testimony is rebutted by what Cavallaro in fact said at other points in his deposition. The defendant notes Cavallaro said he had no knowledge of whether Recalde was told he should not do any repair work — he, Cavallaro, never told him that. The plaintiff goes on to note that the way Recalde learned to operate the machines was by watching other operators, so if Recalde, during his training, observed other operators "doing repairs, it's conceivable that he could think that that's part of his job CT Page 1278 description." The plaintiff then refers to a portion of his own deposition testimony to the effect that he was told that part of his responsibilities was to repair a "few small things." Also, no one at the plant ever told him he should not repair or attempt to repair the machinery. The court has already referred to that portion of Recalde's deposition testimony the defendant Emhart believes is dispositive on this point. Giving the nonmoving party the benefit of every inference, the court concludes that the following facts are undisputed: Recalde was not told he had to repair machines at the defendant's plant but he was also not told he could not repair machines. During his training period, he observed other operators; if they repaired machinery, he could conceivably conclude that was also part of his responsibilities, but Recalde never testified what actual repair work he might have seen other operators perform. Also, he said he was told he should repair "small things" but no definition was given by him or through other operators as to what those "small things" might involve except to say it involved "ring damage" or to "change one knockout" which were not defined or "knockout things" which involved "fingers" which apparently were the knock out pins referred to earlier in this opinion from pages 310-311 of the Recalde transcript. No testimony was presented that it was Recalde's understanding that trying to fix stuck knock out plates was one of the "small things" he was told to repair and certainly no evidence was presented that he saw other operators make such a repair. The only "repair" Mr. Recalde testified he ever did was to replace "knock out pins" on the machine.
In any event, Mr. Recalde went to the rear of the machine to try to correct the malfunction. Mr. Recalde said he put the machine on manual before doing this because during his training he was told when you had a "small problem" that is what was done, (a small problem, apparently that could be repaired by the operator). At one point Recalde testified by putting the machine in manual he was told that shut the machine down (p. 328 of Recalde deposition) but at other points he seemed to say you could in fact operate the machine in manual but it would not go in full cycle. Mr. Cavallaro testified that when the machine is in manual someone could fix a stuck knock out plate "without any risk of injury". Although the machine was put in manual, when Recalde tightened a bolt it activated because an air cylinder under pressure was activated automatically causing the knock out plate to move which trapped his hand. The plaintiff concludes its factual presentation by describing how the accident happened with respect to what Mr. Recalde did after he got to the rear of the CT Page 1279 machine and observed the knock out device. The plaintiff takes the position that if the safety guard on the knock out device were not removed, Mr. Recalde could not have reached into the device and would not have been injured.
Again, the plaintiff relies on the manufacturer's pleadings to "settle" this factual claim between it and Emhart. However, Emhart in its brief seems to concede for the purposes of the motion for summary judgment that this factual representation is true (See Section III D. of defendant's 7/21/98 brief especially title and pages 17 et seq.)
Apart from the separate question of whether "intent" in the context of a case of this type can be resolved by way of summary judgment the relevant facts are in the court's opinion undisputed. Although there is some dispute in the case law about the propriety of using deposition testimony to resolve such motions, here both sides relied almost exclusively on deposition testimony and based on an examination of this material the court can determine whether a genuine issue of fact exists, cf Dubay v.Irish, 207 Conn. 518, 534 (fNa).
 3.
As previously noted our state has adopted one variant of the substantial certainty test. In Suarez v. Dickmont Plastics Corp. ,245 Conn. 255, 280-281 (1997) the court said:
 "Substantial certainty centers on whether the employer believed the injury was substantially certain to follow the employer's acts or conduct." (Emphasis added by court).
It could be said that given the policy compromise represented by the various workers compensation acts real dangers are presented by the adoption of even this fairly restrictive version of the substantial certainty test. Lawson comments on a Louisiana case which also adopted the formula that requires that the employer must have believed that the injurious results were substantially certain to follow, Bazley v. Tortorich,397 So.2d 475, 481 (La, 1981). Lawson then notes at § 68-15(c) p. 13-96 that "unperceptibly the test can become was the result in fact, not in the employer's belief, substantially certain to follow? From this it is an easy step to conclude: of course it was, as the event proved; after all, the result did follow. Ergo, it must CT Page 1280 have been substantially certain to follow". According to Lawson, the only real reason for adopting the substantial certainty test "would be to substitute a measure of objectivity for the subjectivity of "intention". The trouble with this is that this quest for objectivity succeeds only to the degree that the component of the employer's belief is downplayed. In other words, if the essence of the test is what the employer believed, the test is every bit as subjective as a test of what (the employer) intended," id pp. 13-96 — 13-97. The difficulties presented by the application of the substantial certainty test are not recognized only by Lawson. Millison v. E.I. DuPont de Nemours Co., 501 A.2d 505 (N.J., 1985) is regarded as a leading case in this area; it adopted the substantial certainty test but said — "if intentional wrong is interpreted too broadly this single exception would swallow up the entire `exclusivity' provision of the act, since virtually all employee accidents, injuries, and sickness are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to an eventual injury or disease", id page 514.
The dangers then of a broad indiscriminate application of the substantial certainty test are apparent but if the reasons articulated by several courts and including our own are focused on the reasons why it was felt necessary to adopt the test, it can be properly limited. At page 109 of the first Suarez case (229 Conn. 99 (1994)) the court cited other courts that adopted the substantial certainty test. Our court referred to the language of these cases which reasoned that the problem with the true or actual intent test is that it "allows employers to injure and even kill employees and suffer only worker's compensation damages so long as the employer did not specifically intend to hurt the worker", Beauchamp v. Dow Chemical Co., 398 N.W.2d 882,893 (1986). Prohibiting a tort action in such a case our court noted, "would allow a corporation to `cost out' an investment decision to kill workers" Blankenship v. Cincinatti MilacronChemicals Inc., 433 N.E.2d 572, 579 (1982).
These certainly justifiable concerns can be addressed without opening the Pandora's box feared by Lawson if, in effect, the substantial certainty test, is broken down into its component parts. First it should be viewed from a solely factual or empirical perspective — did act A cause injury B to a substantial certainty. This then should be combined with a belief test regarding the likelihood of injury that requires the production of predicate facts to show the belief as to injury in fact CT Page 1281 existed. That is (1) from a purely physical perspective was the intentional doing of act A substantially certain to cause injuryand (2) did the employer in fact believe this to be so. Belief would be established, for example, though prior warnings of accidents involving certain equipment, orders or threats to proceed with a job known by prior experience to be dangerous. These two poles of the test are not unrelated to each other as Lawson seems to assume — occurrence of prior accidents is some indication that such accidents are substantially certain to occur in the future and threats or orders to keep working at a dangerous task indicate the employer believed such tactics were necessary because employees would otherwise be unwilling to work at a dangerous job which the employer believed also to be dangerous.
The question remains, given these general observations is summary judgment procedure appropriate for resolving employee civil actions based on the substantial certainty test.
It is true as previously noted that: "Questions going to intent and motive, which require the drawing of inferences from proven facts, depend for their resolution upon an assessment of demeanor and credibility that is peculiarly within the province of the trier of fact", Gorra Realty Inc. v. Jetmore,200 Conn. at p. 164. And application of this rule might preclude use by the employer of summary judgment procedure, for example, in cases where it is claimed that the employer had an actual or true intent to injure an employee and a civil action is brought by the latter.
But the whole point of the substantial certainty test is that it is not an actual or true intent test and an examination of cases that apply it in the summary judgment context require the establishment of certain predicate facts for it to operate having nothing to do with ordinary questions of "credibility's or "motive". In fact, necessary limitations on the substantial certainty test and the very purpose for its adoption which the court has just discussed require such a result. Even in actual intent cases our court has said: "While we continue to adhere to the general principle that summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions';. . . . it remains, nevertheless, incumbent on the party opposing summary judgment to establish a factual predicate from which it can be determined as CT Page 1282 a matter of law, that a genuine issue of material fact exists",Connell v. Colwell, 214 Conn. 242, 251 (1990), cf Multi ServicesContractors v. Vernon, 193 Conn. 446, 451-452 (1984).
Looking at it from a more general policy perspective it would certainly be an odd result, given the reasons for the exclusivity of remedy provisions of these acts, to conclude that summary judgment procedure is generally not applicable to test a civil action brought by an employee on the basis of the substantial certainty test. Talking about the general purposes of these acts Lawson has said at § 68.15(c), page 13-108:
 "There are two central purposes to exclusiveness: first to maintain the balance of sacrifices between employer and employee in the substitution of no fault liability for tort liability, and second, to minimize litigation, even litigation of undoubted merit."
The very purpose of summary judgment procedure is to minimize litigation" by winnowing out frivolous and legally unmeritorious claims. A simplistic position that equates actual intent with the imputed intent envisaged by the substantive certainty test and dictates leaving these cases to be resolved by juries without the monitoring provided by summary judgment procedure carries with it real dangers for the intelligent enforcement of these workers' compensation acts. That is so because, in deciding whether summary judgment should be entered "the test is whether a party would be entitled to a directed verdict on the same facts",Suarez v. Dickmont Plastics Corp. , 229 Conn. 99, 105-106 (1994). If the same "intent is for the jury" diktat is applied to the substantial certainty test at the directed verdict stage, then, in effect, common law juries will be deciding the scope and reach of the exclusivity of remedy aspect of our act on a seriatim basis. The lack of uniformity and chaotic results that would created in an area of the law that demands the opposite is obvious.
The court has examined numerous cases from several jurisdictions which follow the substantial certainty test and which involve appellate review of motions for summary judgment or motions analogous to our motion to strike filed by employers. Even in cases where rulings on these motions favorable to employers have been reversed, the courts base their decision on the establishment of predicate facts, presented in the record, which dictate that jury resolution is appropriate. They do not CT Page 1283 merely state that such cases are not amenable to summary judgment procedure or resolution on the pleadings because of the nature of the claim made which sounds vaguely in some form of intent.
In fact, several cases explicitly address the issue of whether summary judgment procedure is appropriate in substantial certainty cases and have held that it is. Thus, in King v.Shuykill Metals Corp, et al, 581 So.2d 300, 302 (La, 1991) the Fifth Circuit Court of Appeal of that state said in a case dealing with the substantial certainty test:
 "In brief, plaintiff contends summary judgment is not the proper procedure in which to determine whether an employee's injury resulted from an intentional act. This argument is without merit since the jurisprudence of this state clearly holds that summary judgment is a proper procedural method to consider an employee's allegation that his injury resulted from an intentional act of his (sic) employer" (Court then cites several cases including Louisiana Supreme Court case.)
In a leading substantial certainty Ohio Supreme Court case the court in Van Fossen v. Babcock Wilcox Co., 522 N.E.2d 489,505 (1988) said:
 "Upon a motion for summary judgment pursuant to Civ. R. 56, the burden of establishing that the material facts are not in dispute and that no genuine issue of fact exists is on the party moving for the summary judgment . . . . . However, in that Civ. R. 565(E) requires that a party set forth facts showing that there is a genuine issue for trial, such party must so perform, if he (sic) is to avoid summary judgment. Accordingly, in an action by an employee against his employer alleging an intentional tort, upon motion for summary judgment by the defendant employer, the plaintiff employee must set forth specific facts which show there is a genuine issue of whether the employer had committed an intentional tort against his employee"
See also Rose v. Isenhour Brick Tile Co. Inc.,472 S.E.2d 774, 776 (NC, 1996), North Carolina Supreme Court case briefly describing summary judgment procedure and indicating decision is fact based in a substantial certainty case. CT Page 1284
The just quoted language from Van Fossen exactly parallels the observations on summary judgment standards made in Suarez v.Dickmont Plastics Corp. , 229 Conn. 99, 105 (1994) which our court alludes to before discussing the facts of the case — there the court said "the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact."
 4.
The court will now discuss how courts from several jurisdictions have treated dispositive motions, usually for summary judgment, brought by employers and directed at employee actions based on the substantial certainty test. Then the court will discuss Connecticut Appellate cases. To set a framework for this discussion the court will restate a previous observation — implicit in the Suarez substantial certainty test are two considerations: (1) whether injury is substantially certain to occur purely in the sense of physical causation and (2) whether the employer believed that such injury was substantially certain to occur.
 (a)
There is of course much overlapping in the cases but numerous appellate courts point to a variety of facts that lead them to conclude a particular accident was substantially certain to occur in the physical causation sense and thus disagree with a lower court's dismissal of the employee's civil action or uphold such a holding on the grounds — again after examining the facts — that such an injury was not substantially likely to occur.
Thus in Woodson v. Rowland, 407 S.E.2d 222 (N.C., 1991) the court reversed a lower court's granting of a motion for summary judgment for the employer and concluded there was a material issue of fact. In that case a worker was killed when the trench he was assigned to work in collapsed on him. An expert in soil and environmental analysis submitted a report that the trench "had an exceedingly high probability of failure, and the trench was substantially certain to fall", id, p. 231. An experienced construction worker at the site told the employer who was also there that working in the trench was "unsafe" and he would never put a worker in the trench. Similarly, a Texas Appellate Court reversed the granting of summary judgment in a case where the worker was told to decontaminate a highly radioactive area CT Page 1285 without safety equipment. Kielwen v. Gulf Nuclear Inc.,783 S.W.2d 746 (1990). To show that injury was substantially certain to occur an expert's report was submitted which concluded that it was "impossible" for Gulf Nuclear not to be aware that exposing the plaintiff to such risks without any protection would be substantially certain to cause organ deposits of radioactive material in the plaintiff, id, p. 748. In Van Fossen v. Babcock Wilcox Co., 522 N.E.2d 489 (Oh, 1988) the plaintiff employee was injured while backing down the rear steps of a piece of machinery. The Ohio Supreme Court upheld the granting of the employer's motion for summary judgment and among the factors it noted was that "there were alternative means available to reach the operating position of the equipment." A variety of other factors were discussed by the court but it also noted that "there was absolutely no evidence of other incidents tending to show that the facility was a dangerous instrumentality", id p. 505. Thus, the conclusion must be reached that there was no substantial certainty of injury through use of the stairs.
In Wehri, et al v, Countrymark, Inc., 612 N.E.2d 791 (Oh., 1992) the court affirmed the granting of summary judgment in a case where a worker was injured by an explosion. The court noted there was no evidence to show the employer intentionally placed its workers in areas where harm was substantially certain to occur, id page 793. Also the plaintiff's expert only stated that a "secondary explosion" was a "virtual certainty". But to the court the primary explosion was the critical factor and all the expert said as to the certainty of that was "that the possibility pf a primary explosion `was greatly increased' by inoperative and missing parts," id page 794. The court noted "greatly increases" does not rise to the level of intentional under Ohio's substantial certainty test, id, p. 794.
In a peculiarly tragic case the lower court's granting of summary judgment was reversed in case where a college boy working on a construction project fell through a sky light to his death. The employee was not wearing a safety harness. Not only did OSHA regulations require people working within six feet of an opening be tied off, indicating that that agency concluded injury was otherwise certain to occur, id p. 722, but the plaintiff presented reports from "two well qualified experts who stated that given (the employer's) policies, a fall was only a matter of time. The job supervisor did not have even rudimentary knowledge of the need for and use of safety equipment, id. 723. CT Page 1286
In Gray v. McInnis Brothers Construction Inc., et al,569 So.2d 656 (La, 1990) the trial court's dismissal of the injured worker's complaint was upheld. The worker was injured when a co-worker stepped on an unsecured form, a row of the forms toppled over falling toward the plaintiff. He fell to the pavement below from the scaffold he was working on which had no guard rails. The court said its test required "proof of a strong conexity between the defendant's conduct and the plaintiff's injuries" — it must be a case where injury is "virtually sure" to follow or is "nearly inevitable", id p. 658. In a comment having some bearing on the facts of this case the court at the same page said:
 "Without the exact combination of events — unsecured forms lined up in a row; a co-employee accidently stepping onto one form, causing the others to fall like dominoes; and plaintiff positioned, tying off forms near at hand — plaintiff would not have been injured. These fortuitous circumstances hardly necessitate the conclusion that the result was nearly inevitable or virtually sure to follow, even assuming arguendo the intentional violation of a safety statute."
In McConnell v. Schwegman Bros. Grant Supermarkets Inc.,600 So.2d 779 (La., 1992) a trial court's granting a motion to dismiss was reversed. A worker claimed his leg was crushed when a cable sling broke causing a length of pipe to fall which struck other pipes which then hit his leg. The job supervisor knew that the sling was "rotten" and workers asked him to replace the sling. The court said: "It is a fundamental principle of safety that the longer a known dangerous condition is ignored, the more likely it is that a person will be injured. (The job supervisor) knew with substantial certainty that if he continued to order his men to work with a sling he believed was rotten' someone was substantially certain to be injured", id p. 777.
In Casto v. Fred's Painting Inc., 688 So.2d 72 (La., 1997) a worker was injured when he came into contact with a refrigerator on the employer's premises that emitted an electric shock causing him to lose his balance. The appellate court affirmed the trial court's denial of the employer's motion for summary judgment. The defective condition was known by the employer and the court reasoned: "there was not simply a chance or probability of injury. The shock occurred each and every time a person came in contact with the metal surface of the refrigerator", id p. 74. CT Page 1287 Thus the injury could on this view of the evidence be said to be substantially certain to occur.
 (b)
The court will now focus on the discussion in the cases that in effect say given the fact that there is a substantial certainty of injury did the employer also have reason to believe that this was so. These two concepts overlap but the belief factor is a necessary component of the test given one of the primary reasons on which Suarez justified it — to prevent employers from costing out an investment decision to kill workers citing the Ohio case of Blankenship v. Cincinatti MildaronChemicals Inc, supra. If there is no belief by the employer that with substantial certainty injury will result from its actions in the first place how can the employer's acts be based on a "cost out" calculation? And in fact the cases discussing the propriety of granting summary judgment in these cases discuss the presence or absence of facts indicating the employer's belief about the consequences of his or her actions. , Again the court will discuss only cases from substantial certainty jurisdictions. The court will first discuss cases from other jurisdictions then Connecticut Appellate cases.
In O'Brien v. Ottawa Silicia Company, 656 F. Sup. 610
(E.D. Mich, 1987) a district court following Michigan's substantial certainty test denied the employer's motion for summary judgment where the company had deceased the employee work in an asbestos contaminated area and concealed from him reports of company doctors showing respiratory disease and recommending that the company take precautions to protect him. A similar factual situation in an asbestos case was presented in Millison v. E IDuPont de Nemours Co., supra at 504 A.2d page 516 (company doctor reports concealed from worker). Obviously these actions by the employer were strong evidence that the employer believed in the substantial certainty of injury.
The courts often look to warnings received by the employer concerning a dangerous condition or machine prior to the accident in question from other workers or individuals, Woodson v.Rowland, 407 S.E.2d 223, 231 (NC, 1991); Howard et al v. ColumbusProducts Co, 611 N.E.2d 480, 484 (Oh, 1992), cf Dirksing v. BlueChip Architectural Products, 653 N.E.2d 718, 722 (Oh, 1994) (job supervisor was asked to put up planks, safety net because of skylight); Rose v. XYZ Cable Co. Inc. et al, 600 So.2d 774, 777
CT Page 1288 (La, 1992) Armstead v. Schwegman Giant Super markets,618 So.2d 1140, 1142 (La, 1993).
An important factor is whether prior accidents involving the same job site or equipment had occurred and the frequency of such occurrence.
An absence of prior accidents or injury using the same equipment or work procedures has been cited by some courts as one reason why summary judgment should not be granted. Van Fossen v.Babcock Wilcox, supra at 522 N.E.2d page 505, Wehri v.Countrymark. Inc., supra at 612 N.E.2d pages 793-794, Rose v.Isenhoun Brick Tile Co., 472 S.E.2d 774, 776 (1996), King v.Shuykill Metals Corp. et al, 581 So.2d 300, 303 (La.App., 1991),Regan v. Amerimark Building Products, 489 S.E.2d 421, 424 (NC, 1997).
In Kachadorian v. Great Lakes Steel Corp. , 424 N.W.2d 34 (Mich, 1988), a worker was killed when ordered to drive his vehicle under a vessel containing molten steel and the material fell upon him. In overruling the dismissal of the plaintiff widow's complaint, the court noted there had been spills of molten material before. In Holtz v. Shutl Pattern Works Co,626 N.E.2d 1029, 1030 (Oh, 1993), the Appellate Court reversed the trial court's granting of the employer's summary judgment motion. The worker had a finger amputated while using a machine without a safety device. When he returned to work the owner said "the sign of a good pattern maker is how many fingers are missing". This is certainly an indication that the employer had reason to believe workers had been injured running the machines in the past.
The cases also consider whether the employer had violated its own safety procedures or whether the accident resulted from a violation of its own safety regulations or those of governmental agencies such as OSHA. This coupled with a dangerous condition provides some indication that the employer had reason to know and believe the danger existed because of its past history and was not acting innocently.
In Richie v. Rogers Cartage Co., 626 N.E.2d 1012, 1016-1017
(Oh, 1993) the court noted the employer had not used a safety device or cleaning procedures it had used in the past and which were safer and used these considerations as factors in reversing the granting of the employer's summary judgment motion, cfArmstead v. Schwegman Giant Supermarkets, supra 618 So.2d at p. CT Page 1289 1142 (summary judgment for employer not reversed where its safety check sheets indicated meat grinder needed repair to safety switch and repairs not performed.) In Dirksing v. Blue ChipArchitectural Products, supra at 653 N.E.2d 723, the court in reversing the granting of summary judgment noted that the employer had received OSHA violations for failures to provide a safe workplace similar to the actions leading to the accident before, cf similar comment by court in Woodson v. Rowland,407 S.E.2d 222, 231 (NC, 1991). On the other hand, one court pointed to the lack of any prior history of OSHA violations regarding the condition causing the injury as a factor supporting the trial court's granting of a motion for summary judgment, Rose v.Isenhoun Brick Tile Co. Inc., supra at 772 N.E.2d p. 56. In Reganv. Amerimark Building Products, supra 489 S.E.2d at page 424, there was an OSHA violation but the agency had given the company permission to use the site and the company was working to correct the situation. In Dunleavy v. Yates Construction Co.,442 S.E.2d 53, 56 (NC 1993) the court upheld the granting the motion for summary judgment and noted among other things that the employer had only one previous citation for violation of safety procedures. Other cases refer to situations where the employer ordered employees to work at a machine despite prior complaints about its safety with the explicit or implicit threat that failure to do so might mean loss of the job. The need to make such threats to secure worker compliance indicates that the employer knew and believed the machine or job condition was dangerous, see Walton v. Springwood Products, 663 N.E.2d 1365, 1369
(Oh, 1995), cf Rose v. XYZ Cable Co. Inc. et al, supra at 600 So.2d page 777 (III H), Woodson v. Rowland, supra at 407 S.E.2d page 232. In Van Fossen the court in upholding 27the granting of the summary judgment motion noted, among other things, that the employer never ordered the worker to use the steps on which he slipped and was injured, 522 N.E.2d at page 505, but compareArmstead v. Schwegman Giant Supermarkets, supra at 618 So.2d page 1142 where summary judgment for employer not overturned despite fact problems with meat grinder machinery reported to management and safety checklists indicated repairs should be made to safety switch but plaintiff instructed to continue using the machine.
Finally, the court will discuss a subcategory of cases that specifically address the problem raised by the factual setting of this case. These cases involve the removal of safety devices.
Some states do not give the fact that a safety device was removed any special significance as such but just analyze such CT Page 1290 action in terms of the dangers it presents and use the just discussed standard criteria to determine whether the substantial certainty test has been met. Thus, in King v. Schuykill MetalsCorp. , 581 So.2d 300 (La.App. 1991) the plaintiff employee was injured when his left hand was caught in the blades of a screw conveyor he was in the process of cleaning. The plaintiff's affidavit alleged he was ordered to clean the apparatus "while it was running with its safety cover removed." Apparently, the cleaning procedure was a normal aspect of the running of the machine and was done four or five times a year. A former co-worker also submitted an affidavit on the plaintiff's behalf stating he had warned the company of the danger presented by having the conveyor cleaned in this way and that it was illegal. An incident was also mentioned by the co-worker in which six months before the plaintiff's injury another worker nearly lost an appendage in a screw conveyor being operated without a safety cover. The plaintiff submitted the report of a safety expert in which he stated the company knew the plaintiff's injury was substantially certain to occur under the circumstances, id pp 302-303.
The court upheld the trial court's granting of the employer's motion for summary judgment. It said "high probability" that an accident will occur does not translate into the "virtually sure" or "incapable of failing" standards of Louisiana's substantial certainty test. The court noted the finding that there was no substantial certainty here was "supported by the fact that other Schuykill employees cleaned similar screw conveyors in this manner for years without injury, and that plaintiff himself had previously cleaned the same conveyor without incident on prior occasions," id. Page 303. The court concluded by saying that no issue of material fact was raised by the plaintiff's affidavits nor by the fact that the company had been warned of the danger presented by the machine and a "near injury" had occurred in the past, also see Arnstead-v. Schwegmann Grant Supermarkets, supra.
The North Carolina Supreme Court takes a similar view as the Louisiana courts as to the effect of the removal of safety guards on machines which are meant to protect the operator while working at the machine. In Pendergrass v. Card Caretric, 424 S.E.2d 391
(NC 1993) the court held that directing the plaintiff to work at machine causing him injury did not meet the substantial certainty test although safety guards were removed in violation of OSHA regulations. Id. pp 394, 395; the court could not find there was substantial certainty of injury. Lower North Carolina courts have CT Page 1291 enforced this position, see Regan Amerimark Building ProductsInc. supra, Kolbinsky v. Paramount Homes Inc., 485 S.E.2d 900, 902
(NC App, 1997).
The development of Ohio case law on this subject is interesting and conflicting. In Watson v. Aluminum ExtrudedShapes, 575 N.E.2d 234 (1989) an intermediate appellate court held that the test established by its Supreme Court in Van Fossen, and a predicate to proving "intent" under the substantial certainty test, is satisfied where there is "direct evidence of the employer's removal of the safety guard on equipment that the employee was assigned to operate," id. Interestingly, the court still felt it necessary to refer to testimony from a plaintiff's expert that injury is virtually certain where an employee operates a hand-fed, foot operated unguarded punch press. Perhaps even more importantly the expert went on to say "point of operation guarding" on power presses has existed for fifty years and is required by state and federal regulations. id, p 237. InWatson and indeed in all the cases discussed in this portion of the decision the safety device was designed to protect the worker in the ordinary operation of the machine or in ordinary removal of waste materials and cleaning activities associated with the machine's operations. In Watson itself, the worker's thumb was removed as he tried to remove a piece of metal he was working on after it became jammed. Without the safety guard the press activated as he tried to free the metal. But very interestingly the court in a footnote at page 237 said "Our interpretation of Ohio case law does not extend to removal of a safety device during a process unrelated to the operation of machinery." An Ohio Court of Appeals case decided one year after Watson did not follow the latter case's apparent finding of prima facie establishment of substantial certainty where an operational safety device was removed — other evidence had to be presented that the employer knew that the operation of a turkey deboner without a safety guard was substantially certain to cause injury so summary judgment was appropriately granted. McNeal v. Bil-MarFoods of Ohio, 585 N.E.2d 892, 896 (1990). An Ohio Supreme Court case attempted to bring some order into this area when it stated: .
. . "we hold that where the facts in a given case show that the employer has deliberately removed a safety guard from equipment which employees are required to operate, trial courts may in their determination of motions for summary judgment pursuant to Civ.R. 56 and in the application of our common law pronouncements of what CT Page 1292 may constitute an `intentional tort', consider this evidence, along with other evidence in support of, and contra to, such motion for summary judgment", Fyffe v. Jeno's Inc., 570 N.E.2d 1108, 1113 (1991) .
The court seemed to be saying that in administering the substantial certainty test at the summary judgment level the removal of operational safety guards was to be viewed just as any other dangerous condition created by employer actions.
In Fyffe itself, the court reversed the court of appeals upholding of the trial court's granting of the employer's motion for summary judgment. The court's rendition of the facts indicates a la Watson that an operational safety device was involved. The worker was required to put his hand in a conveyor to retrieve objects while it was running and was never told not to do so. The safety device wou]d have prevented a worker from doing so and being injured as the plaintiff claims to have been injured. Employer knowledge and belief about the substantial certainty of injury was established by a supervisor's acknowledgment that the machine should not have been run without the safety device and a post| accident report prepared by management which admitted the hazardousness of the condition, id. pp 1113-1114. The opinion is replete with references to the fact that the safety device was removed to push the plaintiff to work faster, a supervisor stated the conveyors were cleaned while being run because they cleaned faster that way. The practice was "normal", "sanctioned", and a "common practice", id. p 1113.
These comments of the court on the nature of the safety device being considered are related to one of the very reasons Ohio adopted the substantial test in Blankenship v. CincinnatiMalacron Chemicals Inc., supra, in the first place. Corporations must not be allowed to cost out an investment decision to maim or kill workers (reasoning which Suarez adopted). This reasoning applies only to those safety devices directly affecting the speed or productivity of a worker while he or she is engaged in the ordinary operation of the machinery. That is the only context in which a cost out calculation by an employer can be made with any degree of certainty or such degree of certainty as would warrant making an exception to the exclusivity provision of the act.
Interestingly, an intermediate Ohio appellate court case seems to contradict Fyffe in stating how to treat the removal of safety devices in a summary judgment context but still appears to CT Page 1293 recognize a distinction regarding the application of its rule depending on the nature of the safety device in relation to the operation of the machine: .
. . "we hold that where the safety feature omitted is not a secondary or ancillary guard, but the primary protective device, the failure of the employer to attach such a guard creates a factual issue which would be sufficient to overcome a summary judgment exercise in the rule announced in Fyffe," Walton v. Springwood Products, 663 N.E.2d 1365, 1369 (Oh, 1995) (emphasis added)
 (c)
The court will now examine Connecticut Appellate cases as they concern the application of the substantial certainty test. Are the relevant factors different from those considered in other states?
There have not been many Connecticut Appellate cases in this area. Jett v. Dunlap, 179 Conn. 215 (1979) first created an; exception to the exclusivity provisions of the act for intentional torts committed by the employer. Mingachos v. CBS, Inc., 196 Conn. 91 (1985) first adopted the "substantial certainty" exception but the inadequate record presented to the court, id. p 114, does not permit the case to offer much guidance. Quimby v. Kimberly Clark Corporation,28 Conn. App. 660, 665 (1992) involved a motion to strike filed by the employer that was granted on the basis that general allegations in the complaint were not adequate to raise a claim under the actual intent or substantial certainty test.
In Suarez v. Dickmont Plastics Corp. , 229 Conn. 99 (1994) (Suarez I) the court further explained our substantial certainty test and overruled the trial court's granting of a motion for summary judgment. The court first discussed the standards for granting a motion for summary judgment, then examined the facts to see if a genuine issue of material fact existed under the substantial certainty test. In Suarez I, the undisputed factual allegations were that the machine involved was a plastic molding machine that exuded hot molten plastic. The employer required the plaintiff and other workers to clean the plastic molding machine while it was in operation, refused to allow these workers to use safer cleaning methods and refused to equip the machine with a CT Page 1294 protective cover or other device to prevent injuries to workers operating or cleaning the machine, id. page 101. The plaintiff submitted an affidavit to the effect that (1) although his foreman knew of the dangers the foreman told him that he could not use a vacuum cleaner to clean the hot material from the machine and had to use his hands because using a vacuum cleaner would waste material, (2) the machine could not be turned off during cleaning because it would "waste time" and (3) if the plaintiff used the vacuum cleaner he would be fired. The plaintiff's expert described the operation of the machine. He noted that this company's procedures violated OSHA regulations and accepted safety standards. He concluded even remedying any one of its numerous unsafe actions would have allowed the company to avoid injuring the plaintiff and from a combination of factors it was clear that the injury suffered was a predictable and probable event, id. pp 102-104. The plaintiff had two of his fingers on his master hand partially amputated and claimed a permanent loss of use of this master hand along with scarring.
Based on these facts, the court overruled the trial court's granting of the employer's motion for summary judgment. The result is not surprising and corresponds with what most appellate courts in substantial certainty jurisdictions would have done given a similar fact pattern. As in those cases, various relevant factors were pervasive to the court's result. Given the nature of the process the plaintiff was ordered to perform, expert testimony was hardly needed to convince the court that a worker at this machine was substantially certain to be injured — the dangerous process was a planned and continuance part of the plaintiff's job responsibilities.
The belief part of the test is amply met; the foreman knew of the dangers and there were several violations of safety regulations. In fact, the foreman said the dangerous procedure would continue to be standard operating procedure because it saved the company money and increased productivity. The employer's belief in the dangers the procedure presented was underlined by the fact that its foreman had to threaten firing workers to insure compliance with its orders. The only material submitted by the employer was apparently an affidavit by the company president that he had not intended for the plaintiff to be injured. The case is a veritable catalogue of all the reasons why courts in other jurisdictions have held that summary judgment for the employer would not be appropriate. A variety of predicate facts were set forth by the plaintiff which indicated a prima CT Page 1295 facie case for the substantial certainty test had been made out and that a genuine issue of material fact prevented the appropriate granting of the motion. The only factor not mentioned was any history of prior accidents. But the operational process was so obviously dangerous, that absence of this factor did not require a result contrary too that reached by the court. In fact, this is a classic case where at least at the summary judgment stage a prima facie case had been made out to indicate the employer was costing out an investment decision to maim workers and trying to use the protections afforded by the act to do so — if the statements of the foreman are to be believed this is not even implicitly but rather explicitly the case.[2]
 (5)
Relying on these general principles supplied by other jurisdictions and our own, the court will not review the facts of this case to determine whether the employer's motion for summary judgment should be granted. Or to put it more exactly has an evidentiary foundation been established to demonstrate the existence of a genuine issue of material fact thus precluding the granting of this motion. The court will analyze the problem in accordance with the variant of the substantial certainty test adopted by our own court and defined in Suarez II at 242 Conn, page 280. The court will discuss the two aspects of the test previously referred to (1) substantial certainty from the point of view of physical causation and (2) the employer's belief in the substantial certainty of injury. The court will rely on the factual record presented by both sides and on its own review of the depositions attached to the motion for summary judgment.
 (a)
The record does not establish the existence of any predicate facts which would allow the court to conclude that there was a substantial certainty from the point of view of actual physical causation that injury would occur here. If the focus is confined to the actual operation of the machinery which caused the injury, how can the court conclude that the tightening of a second bolt on the knock out plates was substantially certain to have caused injury. Suarez, Fyffe v. Jeno's, Inc., supra, and Watson v.Aluminum Extruded Shapes, supra involved situations where workers were required to remove material from operating machinery. In this case, how is it that someone's hand would be caught between the plates of the machine, is that a necessity or inevitable CT Page 1296 consequences of tightening one or both bolts due to the location or size of the bolts; the way one positioned one's body or hands, the way in which the knock out plates come together after a bolt is tightened? No expert testimony was presented on this question and the court cannot find substantial certainty merely because a tragic accident occurred. All machinery presents a certain level of danger.
If the more appropriate focus is not the immediate process which injured Mr. Recalde, the substantial certainty finding would be even more difficult to reach. Mr. Recalde was hired to operate not repair machines. The machine he worked on had operating problems fairly frequently but Mr. Cavallaro who was the defendant's plant manager the day of the accident and had held that job for eight years stated in his experience a knock out plate had jammed as it did the night of the accident only once or twice and the workers had gotten them to work properly by hitting them with a "rake". Thus, even if Recalde as an operator was trained by other operators to make "small repairs" — a term never completely defined — there was no indication he was trained or would have reason to be trained to make the type of repair that would unjam the knock out plates or go to the back of the machine and place his hands somehow inside it to do so.
The third shift, on which Mr. Recalde was injured, did not have a maintenance person assigned to it — this is certainly a cost saving factor. But the problem for the plaintiff's position is that there is no predictable pattern of machine breakdown involving the jamming of the knock out plate so how could it be said that failure to have a maintenance person on this shift made an injury of this type involving the knock out plate a substantial certainty?
Mr. Recalde was alone in the plant the night of the injury and when his hand became stuck in the machine for a horrible thirty minutes or more no one could come to assist him but this was due to a severe snow storm. When he came to work he could have worked at machine one or four in light of the fact that the only other operator scheduled to work did not appear. He chose to continue to work at machine four despite the note as to the loose plate and the fact that his machine in fact ended up jamming.
This tragic incident seems to have been the result of the very type of fortuitous circumstances and decisions made by the employee himself that hardly form a basis to conclude that the CT Page 1297 injury that occurred here from the point of view of physical causation was substantially certain to result, of Van Fossen v.Babcock Wilcox, supra, Gray v. McGinnis Brothers Construction, Inc., supra.
 (b)
Even if the foregoing analysis is faulty, the second aspect of the substantial certainty test must be examined. The question must be asked as to whether predicate facts have been established to indicate that there is a genuine issue of material fact as to whether the employer believed there was a substantial certainty of injury.
There are really no such predicate facts. There is no prior history of injury caused by this machinery. As noted, a man who had been the plant manager for eight years at the time of the accident said the knock out plates had jammed only once or twice in his experience and the workers had fixed this problem by banging on the machine with rakes. Mr. Recalde himself had never seen a note when he came on duty similar to the one he saw from another operator the night of the accident that the knock out plate was loose. From this perspective, it is of no relevance that Recalde was not taught safety procedures surrounding the knock out plate or not putting his hand inside it or that even on manual the machine could engage, since the employer would have no warning and thus, basis to believe such precautions would be necessary. This is especially so since Mr. Recalde was hired to operate, not repair the machines, and there is no indication his training in "small matters's had anything to do with the type of breakdown that occurred here even though he might have assumed this breakdown was a small matter he could deal with himself. From all of this, it can be said that there is no indication that the employer or anyone who could bind it legally was actually aware of any danger presented by assigning Recalde to his job — what facts have been , produced to indicate the employer had reason to know the machine would break down, what evidence indicates even that the employer knew Recalde would try to repair the machine? There was a note left on the machine, apparently by the previous operator that the knock out plate was loose — whatever that means; let it be assumed that the employer can be held to have notice of this portion of the note. But the note went on to say the machine was running fine.
Unlike Suarez there is no evidence to indicate Recalde or any CT Page 1298 other employee was ever told that he or she had to continue working at the machine and if it broke down the employee would be fired if the worker did not somehow get it running again. Mr. Recalde may have felt leaving early on the night of the accident would not look very good since he was a new employee but nothing has been offered to indicate this perception was created by anything the employer said or did.
The plant manager, Cavallaro, stated in his deposition that if a worker left a machine down because it would not operate, he would work on another machine or "sort". A worker in that situation could go home if there was no work to be done after a machine breakdown and still collect four hours pay. All of this hardly indicates a scenario where employer threats and warnings can be used to inferentially establish that such measures were necessary and consciously taken to ensure workers would work on a machine known to be dangerous.
Referring to other factors cited in the cases, unlike the situation in Suarez, there is no indication or evidence of violations of OSHA or other safety regulations or codes either involving this machine, the knock out plate aspect of the machine, or general plant operations.
In addition, there is no indication that removal of the safety guard permitting access to the knock out plates was done to enable workers to engage in dangerous operational tasks in order to increase productivity or otherwise speed production — in other words, the act of removing the safety guard had nothing to do with enhancing operational performance as in Suarez. As noted, even the Ohio cases seem to make this a prerequisite of any weight they in fact do give to the removal of safety devices. Why is this so? Because, as previously discussed, it is related to the whole reason why Ohio in Blankenship is such a strong advocate of its method of application of the substantial certainty test — employers must not be permitted to cost out investment decisions to maim or kill workers. Suarez adopted and cited this language in Blankenship. In other words, if the safety device has nothing to do with day to day operational productivity but is some kind of ancillary device to protect against injury when some fortuitous breakdown occurs or unpredictable repair is necessary, how can it rationally be said that under these circumstances a company would be permitted to cost out investment decisions to maim workers by removal of a safety device of this type if it was still permitted to rely on the protections of the CT Page 1299 act.
This is a tragic case. Personally, the court is not quite so sure that the great "compromise" reached by the workers' compensation act should be operative where a worker is maimed — life long pain and suffering after all are involved. But short of any constitutional difficulty with the "compromise", a court's personal feelings and values must be irrelevant as Lawson admonishes, § 68.15(e), page 13-97. It is up to the legislature not the courts to address aspects of the compromise that might not seem fair or might seem to lead to overly strict results. At page 13| 108 Lawson says: "As to how intentional tort fits in with the balance of sacrifices, it must be remembered once again that this is a no-fault system as to both employer and employee. `Unjust' results by conventional standards are commonplace." As Lawson further points out, the concept of intentional injury should not be stretched because courts "cannot quite accept the non-fault nature of workers' compensation", p. 13-97. This the court found difficult to do but under the case law it concludes it has no other choice than to grant Emhart's motion for summary judgment.
Corradino, J.